**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **TAMAR RUTH,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-25-1727** |
| **BOARD OF EDUCATION OF** | * | |
| **MONTGOMERY COUNTY,** *et al.*, | | |
| | * | |
| **Defendants.** | | |

**MEMORANDUM OPINION**

Tamar Ruth filed this action against the Board of Education of Montgomery County ("Board") and superintendent Thomas W. Taylor in his official capacity, alleging that while she was employed as an assistant principal with Montgomery County Public Schools ("MCPS"), she was discriminated against on the basis of her race and disability and retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); and 42 U.S.C. § 1981.[1] The defendants' motion to dismiss Ruth's complaint for failure to state a claim is granted.

## I.    Background

Ruth is African American. ECF 1, at 8. "Her specialty and experience [is] in the area of elementary education." *Id.* at 3. She began working for MCPS as a teacher in 1996 and was promoted to assistant principal in 2006. *Id.*

---

[1] The Court held a hearing on the motion to dismiss on January 26, 2026. During the hearing, Ruth confirmed that she did not object to substituting the Board as a defendant in place of the named defendant Montgomery County Board of Education, and that she also did not object to dismissing all claims against Taylor with prejudice as duplicative of her claims against the Board. Accordingly, the Board is so substituted, and the claims against Taylor are dismissed with prejudice. Because the claims against Taylor are dismissed with prejudice, the remainder of this opinion addresses only Ruth's claims against the Board.

Ruth alleges that after she began working as an administrator, she "had a more expansive view concerning discrimination in the school system" and that she "observed disparate treatment against people of color generally," in particular against African American families and African American boys. *Id.* She "began advocating for African American families," and in response, "superiors and other staff members" subjected her to "microaggressions and pushback[.]" *Id.*

In 2018, Ruth was transferred "to a school which did not have a large population with special needs or who would require advocacy or special attention." *Id.* at 4. This was an undesirable transfer for Ruth because her expertise was "in engaging students in marginalized populations and setting them on track for learning and success." *Id.* Ruth states that she was moved to this school "despite the absence of any performance issues or punitive justification[.]" *Id.* The school to which she was transferred in 2018 "had a culture of racism[.]" *Id.* For instance, an African American student "submitted a letter detailing incidents of discrimination and indicating [that] the student felt subjected to discrimination." *Id.* Ruth says that the gay, Latina president of the Parent Teacher Association "had her home destroyed by fire in what was suspected to be arson." *Id.*

In July 2021, Ruth took a leave of absence, due to anxiety and post-traumatic stress disorder ("PTSD") brought on by "the pressures of advocacy, the COVID pandemic, and the microaggressions [she] experienced[.]" *Id.* During her leave, "[s]he requested part-time work" as a reasonable accommodation "so that she could return to work" and also indicated that she would be willing to be demoted "and return to the classroom," but MCPS denied her request. *Id.* at 4–5.

Although her allegations are not entirely clear on this issue, Ruth appears to have been on leave from 2021 until 2024. In February 2024, less than a month before she returned to work, Ruth filed what she describes as "a bullying/harassment complaint" with the "MCPS Ombudsmen." *Id.*

at 5. Ruth states that the ombudsmen assured her that her complaint would be investigated, but she never received any follow-up. *Id.*

That same month, Ruth submitted a reasonable accommodation request that "would allow her to work in an environment with less stress and discrimination" and that was "more suited for her given her anxiety and other mental health conditions." *Id.* at 6. MCPS denied this request too. *Id.*

Ruth was cleared to return to work in March 2024. *Id.* at 5. Upon her return, she was initially assigned to work at an elementary school. *Id.* However, a week later, she was transferred to a middle school, despite having no middle school experience. *Id.* Ruth objected to the middle school transfer. *Id.* The following week, she was transferred to Ritchie Park Elementary School ("Ritchie Park"). *Id.*

The principal of Ritchie Park was a man named Andrew Winter. *Id.* Ruth states that Winter was "on leave at the time of [her] transfer based on allegations of child abuse[.]" *Id.* Ruth was the acting assistant principal in his absence. *Id.* Ruth had previously "expressed a desire to avoid working with [Winter] or as his subordinate[.]" *Id.* Ruth believes that her transfer to Ritchie Park was "retaliatory" because she had "previously complained about . . . Winter[.]" *Id.* According to Ruth, Winter "had a poor reputation in terms of working with African American families, students and staff[.]" *Id.* Ruth believed, based on her own past experiences with Winter, that he "harbored discriminatory animus against African Americans." *Id.* Winter "created a culture of race discrimination and retaliation at Ritchie Park[.]" *Id.*

During this period, beginning in February and continuing to May 2024, Ruth sought out positions that she believed would be "more favorable" to her "mental health condition." *Id.* at 6. Representatives from human resources, however, "told [her] that there were no available positions

for her or that there were no Assistant Principal positions to which she could transfer." *Id.* Ruth believes this was false. *Id.* In Ruth's view, "MCPS denied these positions to her because of her complaints and advocacy for herself and African American students." *Id.*

During her time at Ritchie Park, Ruth learned about an African American student whom staff members were calling a "bad boy." *Id.* at 5–6. She developed a positive relationship with this student and "was able to look deeper into his experience and the concerns . . . through the lens of racism." *Id.* at 6. In the course of her relationship with the student, Ruth learned that he should have had an individualized education program ("IEP") but lacked one, and that school staff had "subjected [him] to inappropriate actions[.]" *Id.* Ruth then filed "a complaint of bias and hate" on the student's behalf in May 2024, prompting an investigation in which she was interviewed by the police and discussed the complaint with human resources. *Id.*

Sometime in May 2024, Ruth was instructed to facilitate "a previously unscheduled IEP meeting for a student" over Zoom. *Id.* at 6–7. During the meeting, "a student who was upset or disturbed and who should have been in the classroom came to Ruth's door." *Id.* at 7. Ruth attempted to speak to the student and "calm[] the situation," but the student "continued to beat at her door in an attempt to gain entry." *Id.* This event so disturbed Ruth that it, along with "the circumstances with the transfer and the hostility she received[,] exacerbated her mental health condition" to the point that she began to have "an emotional breakdown." *Id.* "She was hospitalized for a week" and engaged in therapy after she was discharged. *Id.*

On November 20, 2024, Ruth filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 3.

On January 20, 2025, Ruth "requested a reasonable accommodation . . . in order to facilitate her return to work," including "that she be permitted to work part-time initially and to gradually

4

increase her hours of work; that the functions of her Assistant Principal position be transferred to other staff members for support"; and that she "be provided with written instructions for work assignments; . . . additional supervision and/or clinical support with new and/or complex projects, progress performance reviews and any communication issues related to her disability; and . . . breaks, as needed." *Id.* at 7. MCPS denied these requests on February 26, 2025. *Id.*

On March 3, 2025, the EEOC issued a right to sue letter. *Id.* at 3.

On May 30, 2025, Ruth filed this lawsuit. She asserts claims of race and disability discrimination and retaliation in violation of Title VII, the ADA, and § 1981. She seeks declaratory, injunctive, and monetary relief. The defendants filed a motion to dismiss on July 16, 2025, ECF 13 & 13-1, which is fully briefed, ECF 15 & 16. The Court held a hearing on the motion on January 26, 2026.

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus*

*Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting

*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and

"draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765

(4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does

not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable

conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir.

2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455

(4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory

statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d

230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212

(4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or

the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v.

Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings,

documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d);

*see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents

integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak

v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

## III.   Discussion

### A.   Timeliness

As a preliminary matter, the parties agree that, in connection with Ruth's Title VII and

ADA claims, the Court may not consider any alleged discriminatory or retaliatory acts that

6

occurred before January 25, 2024. This is because a Title VII plaintiff in Maryland must file a charge of discrimination within 300 days of each alleged discriminatory or retaliatory act "or lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *see also Davis v. Balt. Hebrew Congregation*, 985 F. Supp. 2d 701, 713 (D. Md. 2013) (explaining that because Maryland is a "deferral state," the time limit for filing an EEOC charge is 300 days). The same rule applies to ADA claims. *See, e.g.*, *Handon-Brown v. Wash. Suburban Sanitary Comm'n*, No. RWT-13-3223, 2015 WL 1137728, at *2 (D. Md. Mar. 11, 2015). Ruth filed a charge of discrimination with the EEOC on November 20, 2024. Three hundred days before that date is January 25, 2024. Thus, to the extent Ruth's Title VII and ADA claims are predicated on discriminatory or retaliatory acts occurring before January 25, 2024, they are time-barred.[2]

### B.     Title VII Race Discrimination Claim

Ruth alleges that the Board discriminated against her on the basis of her race "by transferring her to less desirable positions and by refusing transfers to the positions she sought or to which she applied." ECF 1, at 8.

Title VII forbids employers from "discharg[ing] any individual or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). "Absent direct evidence" of discrimination, "the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside

---

[2] Ruth also asserts § 1981 claims. The statute of limitations for § 1981 claims is four years. *See James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421 (4th Cir. 2004). Thus, Ruth's § 1981 claims cover alleged discriminatory and retaliatory acts dating back to May 30, 2021. Even with an extended limitations period, Ruth's § 1981 claims do not survive the motion to dismiss for reasons discussed at the end of this opinion.

the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "Although a plaintiff need not plead a prima facie case of discrimination to state a claim, reference to the prima facie case may nonetheless inform a court's evaluation of a motion to dismiss." *Wooten v. Univ. of Md., Balt.*, 733 F. Supp. 3d 402, 417 (D. Md. 2024). The facts alleged must be sufficient "to satisfy the elements of a cause of action created by" Title VII, *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)), and the plaintiff must plausibly allege that the "relevant decisionmaker was motivated by her race," *Barnhill v. Bondi*, 138 F.4th 123, 131 (4th Cir. 2025).

Ruth alleges the Board discriminated against her when it transferred her to undesirable schools and denied her transfer requests. A transfer (or a denial thereof) may constitute a harm actionable under Title VII when it leaves the employee "worse off" in some way with respect to her "employment terms and conditions"—even if there is no attendant pay cut or change in rank and even if the employee is able to seek other positions. *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Ruth alleges three adverse transfers or transfer denials within the limitations period: (1) her transfer from an elementary school to a middle school in March 2024; (2) her transfer a week later to Ritchie Park Elementary School; and (3) her being told, sometime between February and May 2024, that there were no available positions at the schools to which she wanted to transfer. The Court addresses each in turn.

Ruth's March 2024 transfer to a middle school likely qualifies as an adverse action. Ruth alleges that she lacked experience working in middle schools, so it is plausible that being transferred to such a school would leave her "worse off" with respect to her "employment terms and conditions." *See id.* Ruth fails, however, to plausibly allege that this transfer was motivated by discriminatory animus. She does not identify the decisionmaker who transferred her to the

8

middle school, and she does not allege any facts that would suggest the decisionmaker transferred her because she is African American. Nor does Ruth allege any other facts suggesting evidence of discrimination, such as a non-African American employee who was allowed to retain a position in their area of expertise. In fact, Ruth's allegations belie discriminatory animus. As Ruth tells it, one week after she objected to the transfer to the middle school, she was transferred to Ritchie Park— an elementary school. This suggests the relevant decisionmakers were responsive to her concerns and acted promptly to remedy them, not that they intended to subject her to disadvantageous employment conditions on the basis of her race. Thus, Ruth has not alleged a Title VII race discrimination claim based on this transfer.

As for the transfer to Ritchie Park Elementary School, Ruth fails to plausibly allege that this constituted an adverse action. Ruth claims that Ritchie Park was an undesirable place to work because Winter, the principal, "harbored discriminatory animus against African Americans" and "created a culture of race discrimination and retaliation[.]" ECF 1, at 5. Yet Ruth does not explain why she believes Winter harbored racial animus against African Americans or how he created a culture of racism and retaliation. Moreover, according to Ruth's own allegations, Winter was not working at Ritchie Park when she was transferred there, and Ruth never claims that she had to work with Winter or that his return to Ritchie Park was imminent or even likely at any point during her time there. Beyond her conclusory allegations about Winter, Ruth does not point to any specific instance when she experienced racial discrimination or retaliation while working at Ritchie Park. She thus fails to plausibly allege that her transfer to Ritchie Park worsened her employment terms and conditions. That dooms her Title VII race discrimination claim based on this transfer.

Even if Ruth had alleged that her transfer to Ritchie Park was an adverse action, she fails to allege that the transfer was motivated by her race. Once again, Ruth does not identify the

9

decisionmaker responsible for her transfer. Nor does she allege the decisionmaker knew that Winter harbored racial animus against African Americans or that Winter created a racist and retaliatory culture at the school. Ruth also does not plead any facts that would suggest she was transferred to Ritchie Park because she is African American, such as a similarly-situated non-African American comparator. For this additional reason, Ruth has not stated a Title VII race discrimination claim based on her transfer to Ritchie Park.

Finally, the Court considers the denial of Ruth's transfer requests. Ruth alleges that she was misinformed about the existence of other open positions within MCPS to which she could transfer. However, Ruth does not identify the positions she claims were open but was misinformed were not. Nor does Ruth allege that she was qualified for the (unidentified) positions she sought. Even if she had alleged as much, Ruth does not allege circumstances giving rise to an inference of discrimination. Read generously, Ruth's complaint plausibly alleges that (unidentified) MCPS human resources personnel wanted to prevent her from transferring to positions she desired. But Ruth does not plausibly allege that MCPS personnel wanted to deny her transfer requests *because of* her race. For instance, Ruth does not allege that the MCPS personnel said or did anything in connection with the denials of her transfer requests suggesting they harbored racial animus against her. Nor does she allege comparator evidence that might support her allegations of discrimination. Thus, Ruth fails to plausibly allege that she was denied transfers because she is African American.

Ruth's Title VII race discrimination claim is dismissed without prejudice.

### C.     ADA Discrimination Claim

Ruth claims the Board discriminated against her because of her disability in violation of the ADA in two respects: by failing to accommodate her anxiety and PTSD and by "involuntarily

reassign[ing] her or transferr[ing] her [and] refus[ing] to allow her to transfer to desirable positions[.]" ECF 1, at 10.

The ADA prohibits employers "from 'discriminat[ing] against a qualified individual on the basis of disability,'" including by "fail[ing] to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee[.]'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (first alteration in *Wilson*) (quoting 42 U.S.C. §§ 12112(a)–(b)). "Generally, to plead a claim of disability discrimination [under the ADA], a plaintiff must allege facts demonstrating that (1) the plaintiff has a disability; (2) the plaintiff was a qualified individual for the position; and (3) the employer took an adverse employment action, such as discharging the plaintiff, because of the disability." *Gagnon v. Bd. of Educ. of Montgomery Cnty.*, 760 F. Supp. 3d 359, 370 (D. Md. 2024) (citing *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015)).

"A plaintiff is disabled [within the meaning of the statute] if he can show '(1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial.'" *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 751 (4th Cir. 2018) (quoting *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006)). A "qualified individual" is "a person who, with or without a reasonable accommodation, can perform the essential functions of her job," *Stanley v. City of Sanford*, 606 U.S. 46, 54 (2025) (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)), and "[a] job function is" in turn "essential if it 'bear[s] more than a marginal relationship to the job at issue,'" *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004) (second alteration in *Rohan*) (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). In other words, "to prevail under [the ADA's anti-discrimination provision], a plaintiff must plead and

11

prove that she held or desired a job, and could perform its essential functions with or without reasonable accommodation, at the time of an employer's alleged act of disability-based discrimination." *Stanley*, 606 U.S. at 65. Finally, the plaintiff's disability must be a but-for cause of the employer's alleged discrimination. *See Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016).

When an ADA plaintiff's discrimination claim is based on an alleged failure to accommodate their disability, they can make out a prima facie case of discrimination by alleging "(1) that [they were] an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [their] disability; (3) that with reasonable accommodation [they] could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson*, 717 F.3d at 345 (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)) (second, fifth, and sixth alterations in *Rhoads*). As in the Title VII context, while a plaintiff "need not plead a prima facie case of discrimination . . . to survive [a] motion to dismiss," they still must "allege facts to satisfy the elements of a cause of action created by th[e] statute[.]" *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) (first, second, and third alterations in *Miller*) (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 515 (2002) and *McCleary-Evans*, 780 F.3d at 585).

The Court begins with Ruth's allegation that the Board failed to accommodate her disability. For purposes of this analysis, the Court assumes that Ruth's PTSD and anxiety qualify as a disability under the ADA. The Court also assumes that the Board was on notice of Ruth's disability because she alleges that her conditions prompted her to take a leave of absence in 2021. The Court can plausibly infer from those allegations that Ruth would have told the Board why she

12

was taking this leave. And, Ruth alleges that the Board denied her accommodation requests in February 2024 and January 2025.

Still, Ruth's ADA discrimination claim—to the extent it is based on alleged failures to accommodate—nonetheless falters because Ruth alleges no facts from which the Court could infer that the accommodations she requested would have allowed her to perform the essential functions of her position. She does not specify what her job duties as an assistant principal were; nor does she explain how she would have been able to perform those duties had she received the accommodations she sought—breaks, written instructions, temporary part-time work, and the like. Indeed, Ruth's own allegations indicate that at least one of her requested accommodations would *not* have been reasonable. Ruth alleges that she asked for the "functions of her Assistant Principal position [to] be transferred to other staff members for support[.]" ECF 1, at 7. Such an accommodation request—which would "require an employer to 'reallocate job duties in order to change the essential functions of a job'"—is not reasonable. *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) (quoting 29 C.F.R. Pt. 1630 App. § 1630.2(*o*)).

Ruth's other disability discrimination allegations—those based on the involuntary transfers and denied transfer requests—fare no better. Once again, the Court assumes that Ruth has plausibly alleged that she suffers from a disability. She has not, however, plausibly alleged that she was a "qualified individual" because she does not allege facts indicating she could perform the essential functions of her position with (or without) a reasonable accommodation. Moreover, Ruth simply provides no facts from which the Court could plausibly infer that her PTSD and/or anxiety were a cause—but-for or otherwise—of her transfer to the middle school, her transfer to Ritchie Park, or the denial of her transfer requests. Thus, Ruth fails to state a claim of disability discrimination on this basis.

Ruth's ADA discrimination claim is dismissed without prejudice.

### D.        Title VII and ADA Retaliation Claims

Ruth alleges she was retaliated against in violation of Title VII and the ADA. To state a claim for either Title VII or ADA retaliation, a plaintiff must plausibly allege "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Barnhill*, 138 F.4th at 132 (quoting *Coleman*, 626 F.3d at 190); *see also A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011). An employee engages in protected activity under Title VII or the ADA by either "(1) opposing a practice forbidden by Title VII" or the ADA or "(2) participating in a Title VII" or ADA "investigation or proceeding." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 718 (4th Cir. 2024); *see also Thompson v. City of Charlotte*, 827 F. App'x 277, 279 (4th Cir. 2020). Under the antiretaliation provisions of Title VII and the ADA, "an employee is protected when she opposes 'not only . . . employment actions actually unlawful . . . but also employment actions [she] reasonably believes to be unlawful.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc) (first and third alterations in *Boyer-Liberto*) (quoting *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)); *see also Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002).

To sustain a retaliation claim under either statute, an adverse employment action must be "materially adverse"; that is, it must be "serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." *Herkert v. Bisignano*, 151 F.4th 157, 165–66 (4th Cir. 2025) (quoting *Muldrow*, 601 U.S. at 358); *see also Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 (4th Cir. 2020). Causation may be established by a "particularly close [temporal] proximity" between the protected activity and adverse action, *Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th

872, 881 (4th Cir. 2026); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021), or by a "pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity," *Barnhill*, 138 F.4th at 132; *see also Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485 (D. Md. 2015). "In any event, the plaintiff must show that a relevant decisionmaker was actually aware of the protected activity before making their decision." *Barnhill*, 138 F.4th at 132.

### 1.     Title VII Retaliation

Ruth alleges that she was subjected to retaliation in violation of Title VII when she was transferred to undesirable positions and her transfer requests were refused. For purposes of this Rule 12(b)(6) analysis, the Court assumes that Ruth has alleged adverse employment actions.

Ruth has identified three protected activities that she claims resulted in retaliation. First, Ruth claims she was retaliated against because she filed a "bullying/harassment complaint" in February 2024. ECF 1, at 5. Yet Ruth provides almost no details about this complaint. She does not attach or quote from the complaint. She does not identify who experienced the alleged bullying and harassment or whether the bullying and harassment was because of the person's protected traits. Nor does she provide any details about the ombudsmen's duties or responsibilities that might illuminate the nature of her complaint. Without more information, the Court cannot plausibly infer that Ruth opposed a practice actually or reasonably believed to be prohibited by Title VII or that she participated in a Title VII investigation or proceeding when she filed the "bullying/harassment complaint."[3]

---

[3] Another pleading flaw is that Ruth does not allege that any decisionmaker responsible for an adverse action taken after she filed the "bullying/harassment complaint" in February 2024 knew that Ruth had filed the complaint.

Next, Ruth asserts that she was retaliated against because of her "advoca[cy] on behalf of African American students and . . . families." ECF 1, at 9. At the motions hearing, Ruth clarified that this advocacy was the "complaint of bias and hate" she filed on behalf of an African American student in May 2024. *Id.* at 6. Ruth's "complaint of bias and hate," filed on behalf of a student, is not protected activity. This is because Title VII forbids discrimination only in the employer-employee relationship. *See Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 408 (4th Cir. 2015) ("An entity can be held liable in a Title VII action only if it is an 'employer' of the complainant."). To ensure an employee may complain about discriminatory employment practices without fear of retribution, Title VII prohibits employers from retaliating against employees for opposing a practice forbidden by the statute (or a practice the employee reasonably believes to be forbidden), or for participating in a Title VII investigation or proceeding. Those forbidden practices include discrimination by an employer against an employee because of the employee's protected traits. The practice that Ruth opposed was "bias and hate" by MCPS towards an African American MCPS student, not discrimination by MCPS against an African American MCPS employee. By calling attention to "bias and hate" directed at a student, Ruth was not opposing a practice forbidden by Title VII, and she could not reasonably have believed that she was. And because the student was not an employee of MCPS, it is not plausible that the ensuing police and human resources investigations would have constituted a "proceeding or investigation" under Title VII. *See, e.g.*, *Schmidt v. Town of Cheverly*, 212 F. Supp. 3d 573, 578–79 (D. Md. 2016) (police officer who supported wife's discrimination complaint accusing police chief of sexual harassment was not, and could not reasonably have believed that he was, engaged in Title VII protected activity where wife was not an employee of police department).

Finally, Ruth asserts she was retaliated against for "complaining of her own discriminatory treatment under . . . Winter and others." ECF 1, at 9. As best the Court can tell, Ruth appears to be referring to the complaint she made about Winter at some point before her transfer to Ritchie Park. *See id.* at 5 ("[Ruth] had previously complained about . . . Winter and expressed a desire to refrain from working for him or as his subordinate"). The Court assumes, without deciding, that this constitutes protected activity. Even so, Ruth fails to plausibly allege causation. Ruth does not specify when she made this complaint; she states only that she complained about Winter at some point prior to her transfer to Ritchie Park. And she does not allege that any decisionmaker who took the alleged adverse actions knew about her prior complaint about Winter. Without this information, the Court cannot infer a sufficiently close temporal proximity or a "pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity," *Barnhill*, 138 F.4th at 132, between Ruth's complaint and any adverse action.

Ruth's Title VII retaliation claim is dismissed without prejudice.

### 2.  ADA Retaliation

Ruth alleges that she was subjected to retaliation in violation of the ADA because she "complained about disability discrimination and [the Board's] refusal to afford her a reasonable accommodation." ECF 1, at 10. At the hearing on the motion to dismiss, Ruth argued that she also was retaliated against because she requested a reasonable accommodation in February 2024.

As with the Title VII retaliation claim, the Court assumes, for purposes of this analysis, that Ruth has alleged the transfer to the middle school and the denial of her transfer requests were adverse employment actions. And, as with the Title VII retaliation claim, Ruth identifies three potential protected activities.

First, Ruth says she complained about disability discrimination, but she identifies no specifics. The only possible disability discrimination complaint is the "complaint of bias and hate" that Ruth filed on behalf of the African American student in May 2024 when she learned that he lacked an IEP. Yet, at the motions hearing, Ruth's counsel disclaimed any argument that this complaint related to the student's disability. *See* ECF 22, at 20 ("I believe [the complaint] was racial bias and hate on behalf of the student. I don't believe it included an ADA allegation."). That disclaimer was wise because Ruth's complaint contains no allegations that she opposed disability discrimination against the student. In fact, Ruth does not specify the nature of the "bias and hate" at all. Reading the allegations in Ruth's complaint generously, the Court infers that Ruth was objecting to alleged *racial* bias against the student by school staff (an inference Ruth confirmed at the motions hearing). On Ruth's allegations, the Court cannot, however, infer that in filing a complaint on behalf of the student, Ruth was opposing ADA-prohibited conduct.

Next, Ruth asserts she "complained about . . . [the Board's] refusal to afford her a reasonable accommodation[.]" ECF 1, at 10. But she identifies no specific instance, by date or otherwise, in which she complained about the denial of disability accommodation requests. Ruth cannot make out a retaliation claim on those grounds.

Finally, Ruth claims she was retaliated against because of her February 2024 reasonable accommodation request. Requesting a reasonable accommodation is protected activity under the ADA. *See, e.g.*, *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001). Though Ruth alleges she engaged in protected activity, she does not plausibly allege that the protected activity caused the adverse employment actions. Ruth does not allege that the (unidentified) decisionmaker who transferred her to the middle school or the (unidentified) human resources personnel who informed her there were no positions to which she could transfer were aware of her accommodation

request. This dooms her retaliation claim. *See, e.g.*, *Seabrook v. Driscoll*, 148 F.4th 264, 273 (4th Cir. 2025) (Title VII plaintiff failed to plausibly allege retaliation when, although she alleged that she received a poor performance review the month after filing an equal employment opportunity complaint, she "d[id] not allege facts to support an inference that [the supervisor who issued her performance review] was aware of her complaint when he issued her review").

Ruth's ADA retaliation claim is dismissed without prejudice.

### E.     Section 1981 Claims

Ruth asserts claims of racial discrimination and retaliation under 42 U.S.C. § 1981, which "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

Like her Title VII claim, Ruth's § 1981 discrimination claim is based on alleged discriminatory transfers and the denial of transfer requests. As the Court explained during the hearing on the motion to dismiss, Ruth's § 1981 discrimination claim must be dismissed without prejudice because Ruth fails to plausibly allege that the transfers and denied transfer requests resulted from an official policy or custom of discrimination of the Board. *See Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995).

The Court next considers Ruth's § 1981 retaliation claim. Section 1981 "encompasses . . . complaint[s] of retaliation against a person who has complained about a violation of another person's contract-related 'right.'" *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). As in the Title VII context, a prima facie case of retaliation requires a plaintiff to show (1) protected activity, (2) adverse action, and (3) causation. *See Irani v. Palmetto Health*, 767 F. App'x 399, 421 (4th Cir. 2020). A plaintiff may engage in protected activity under § 1981 by "reporting 'employment actions actually unlawful under [§ 1981] . . . [or] employment actions she reasonably

19

believes to be unlawful.'" *Ali v. BC Architects Eng'rs*, 832 F. App'x 167, 172 (4th Cir. 2020) (first alteration in *Ali*) (quoting *Boyer-Liberto*, 786 F.3d at 282).

Ruth's § 1981 retaliation claim is premised on the same three protected activities on which her Title VII retaliation claim was premised. Ruth's "bullying/harassment complaint" and her "bias and hate" complaint on behalf of the African American student do not qualify as § 1981 protected activity. As previously discussed, Ruth does not provide sufficient details about the "bullying/harassment complaint" from which the Court could infer that the bullying and harassment was based on race. And she does not allege that, in objecting to bias and hate against the student, she was opposing a racially discriminatory employment practice or the violation of a contract-related right the student may have had. Thus, the Court cannot infer that, in making either complaint, Ruth sought to vindicate (or reasonably believed that she was vindicating) any rights protected by § 1981. As for the third alleged protected activity, her complaint about Winter, Ruth fails to plausibly allege a causal link between it and any adverse action, for the reasons discussed earlier in this opinion.[4] Thus, Ruth's § 1981 retaliation claim is dismissed without prejudice.

## IV.    Conclusion

The motion to dismiss is granted. A separate Order follows.

Date: March 4, 2026

Deborah L. Boardman
United States District Judge

---

[4] Ruth alleges one adverse action within the four-year limitations period for a § 1981 claim that did not fall within the limitations period for her Title VII claims: the denial of the reasonable accommodation request Ruth made while on leave. However, Ruth pleads no facts that would plausibly suggest that this request was denied because of a policy or custom of discrimination or that it was denied in retaliation for any § 1981 protected activity.